**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CINDY CLARK, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INNAGO, LLC,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Cindy Clark ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Innago, LLC ("Defendant" or "Innago"), and states:

## NATURE OF THE ACTION

1. There is a cost-of-living crisis in our country, one that is especially acute in the housing market. One reason is the relentless imposition of add-on fees in excess of advertised rental rates—including "pay-to-pay" fees like those at issue in this Class Action Complaint ("Complaint")—wherein consumers are charged add-on junk fees by third-party middlemen merely for doing what they are required to do under the terms of their residential leases: make their rent payments.

2. Innago is a middleman foisted onto consumers after they decide to lease an apartment. The existence of Innago is a surprise to consumers who, at the time they decide to rent an apartment, have no idea they will need to make their lease payments through this surprise middleman—or that they will have to pay this surprise middleman for the privilege of making their lease payments. Without authorization or warning, Innago inserts itself into the relationship

between renters and their landlords, then in effect extracts additional, unauthorized rent payments from renters.

3. Plaintiff brings this putative class action seeking statutory, monetary and injunctive relief arising from Innago's deceptive and unfair imposition of junk "Convenience Fees" on rent payments completed through its online platform.

4. Innago's imposition of the Convenience Fee is improper for three reasons.

5. First, it is unfair and deceptive under state consumer protection laws to charge renters fees to make their lease payments, especially when they are not informed of such fees prior to leasing an apartment. Just as an advertised hotel rate reasonably implies there will not be additional fees for using a bed, an advertised lease rate reasonably implies a consumer may pay the amount of a lease without additional charges or the assessment of additional, unauthorized rent.

6. Innago contracts with landlords and apartment owners, and in each case fails to put processes in place at the time of leasing that would require apartment owners and landlords who use its service to procure authorization from consumers to use Innago or to pay extra fees or rent to Innago.

7. Second, at the time Plaintiff signed her lease, she was never informed she would be assessed "pay-to-pay" fees for making her rent payments—and in fact, she was promised the opposite. Her lease agreement did not expressly authorize the assessment of "pay-to-pay" fees. Because Innago knew or should have known the lease agreement did not authorize additional fees for payments of amounts owed under the lease, the assessment of such fees tortiously interferes with tenants' contracts, which bar pay-to-pay fees unless expressly authorized by the original agreement.

8. Third, Innago's payment interface is deceptive and violates state consumer protection laws, which require prominent and accurate disclosure of add-on fees. Instead, Innago hides its exorbitant Convenience Fees during the checkout process. Worse, Innago provides no fair disclosure on how to avoid the Convenience Fees.

9. Plaintiff and Class members are injured by Innago's deceptive, unfair and illegal practices. Plaintiff brings this action to prevent Innago from continuing to engage in its illegal practices alleged herein.

## PARTIES

10. Plaintiff is a citizen and resident of Lockport, New York. At all relevant times alleged herein, she was a tenant of a property in New York and was assessed a Convenience Fee for making rent payments through Innago.

11. Defendant is a limited liability company headquartered in Cincinnati, Ohio. Defendant provides cloud-based management software for online rent collection to landlords and property managers.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction because:

a. the proposed Class is comprised of at least 100 members, § 1332(d)(5)(B);

b. at least one member of the proposed class is a citizen of a State other than Ohio, § 1332(d)(2)(A); and

c. the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, § 1332(d)(2), (6).

13. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant is subject to

personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A. The Rise of Junk Fees in Renting

14. Housing affordability is a significant concern across the country, particularly for consumers who rent their homes,[1] and the proliferation of rental housing junk fees like Innago's Convenience Fee negatively impacts millions of renter households nationwide.[2]

15. Convenience fees for rent payments pose a real threat to consumers' financial stability, particularly considering that they force tenants to spend significant and unbudgeted sums of money each month on top of rent.[3]

16. "Commonly referred to as 'junk fees', these [convenience] fees can be undisclosed, unpredictable, and arbitrary and can quickly accumulate for tenants, putting safe and decent rental housing even more out of reach."[4] These "surprise fees are imposed for services with little or no value to tenants, such as … convenience fees. . . . Such fees can add up quickly, rendering advertised rental prices inaccurate and sometimes forcing tenants to spend hundreds of dollars each month on top of rents."[5]

---

[1] Peyton Whitney, *Housing Unaffordability Soared to New Highs in 2024*, Joint Ctr. for Hous. Stud. of Harvard Univ. (Feb. 4, 2026), https://www.jchs.harvard.edu/blog/housing-unaffordability-soared-new-highs-2024.

[2] *Junk Fees Toolkit*, National Low Income Housing Coalition ("NLIHC") State and Local Tenant Protection Series: A Primer on Renters' Rights, available at https://nlihc.org/sites/default/files/2022-07/SLI_Rental_Fees_Toolkit.pdf at p. 7.

[3] *Id.*

[4] *Id.* at p. 3.

[5] *Id.* at p. 6.

17. In 2022, the National Consumer Law Center ("NCLC") conducted a survey of legal services and nonprofit attorneys throughout the country which examined various types of rental junk fees charged to renters in the rental housing market.[6] The survey revealed that 60% of respondents from 23 states observed convenience fees, and that "[s]ome housing providers no longer accept payment in person or by check, meaning that tenants have to pay their rent online," and oftentimes, must do so "through third-party companies that charge fees."[7]

18. The failure to include these rental junk fees in the total cost of the advertised monthly rental rate is problematic—"While a renter may be able to manage and plan for high rents if they know about them in advance, they may not be expecting an array of junk fees, which could push them over their budgets."[8]

19. Indeed, the FTC recently issued a warning to rental management software companies that their practices may be unfair and deceptive. Specifically, the FTC stated:

> The FTC is committed to rooting out anticompetitive, unfair and deceptive acts or practices in the rental housing market. Consumers who search for potential rental housing units cannot meaningfully compare alternative choices without understanding the total price required to rent the advertised properties. When consumers do not know the total price of the advertised properties—or any product—they cannot make informed decisions, and the market cannot operate as efficiently as it otherwise would. And unfair and deceptive acts in the rental housing market in a time when hard-working Americans continue to suffer the effects of the Biden Administration's cost-of-living crisis are especially harmful to consumers and markets.
>
> Available information suggests that property management software providers are limiting the ability of rental property managers and owners to accurately advertise the total monthly rental price, inclusive of all mandatory fees. Property management software programs may cause consumer harm and harm to

---

[6] *Too Damn High, How Junk Fees Add to Skyrocketing Rents*, National Consumer Law Center, Mar. 2023, available at https://www.nclc.org/wp-content/uploads/2023/03/JunkFees-Rpt.pdf.

[7] *Id.* at pp. 17-18.

[8] *Id.* at p. 6.

> competition in the rental housing market when they do not accurately display complete pricing information across websites hosted on their platforms, or where they restrict property owners' and managers' ability to aggregate or convey accurate cost information to consumers on third-party listing sites.[9]

20. Thus, the FTC warned rental management software companies to comprehensively review their practices to ensure consumers are provided "with transparent rental prices."[10]

21. But Innago's Convenience Fees impede that effort.

22. The consequences are significant. As a leading player in the third-party rental payment processing industry recently acknowledged in a July 31, 2025, blog post:

> [a]lmost half (49.7%) of renters spend over 30% of their income on housing, and nearly a quarter are severely burdened, paying more than half. That's a lot of people and money. The overall cost of renting, including utilities and other basic housing costs, has increased by 3.8% year-over-year—the largest annual real increase in rental costs since at least 2011. That, alongside an increase in grocery, gas, and utility expenses, makes it nearly impossible to have any financial breathing room—but rent waits for no one. Unfortunately, this could mean late fees, overdraft charges, or even falling behind on rent.[11]

23. Despite the financial hardships consumers face in order to meet their monthly rental obligations, Innago nevertheless charges these same consumers, like Plaintiff and Class members, a Convenience Fee to make their monthly rental payments.

### B. Consumers Don't Agree to Pay Innago Anything at the Time of Leasing

24. Innago contracts with property management companies and landlords throughout the country to provide various leasing and resident services, including collecting rent payments from consumers through its online payment processing platform.

---

[9] *See* **Exhibit 1** (footnotes omitted).

[10] *Id.*

[11] https://www.rentcafe.com/blog/apartmentliving/tips-tricks-renters/managing-flexible-rent-payments/ (last accessed July 1, 2026).

25. When consumers like Plaintiff enter into lease agreements, the amount they are to pay each month under the lease is a material term of the lease agreements.

26. The lease agreements explicitly list the monthly cost of rent as well as the costs of other services that are included in the cost of rent. However, the lease agreements do not specifically authorize the assessment of Innago's Convenience Fee. Furthermore, Innago's payment platform merely identifies the amount consumers like Plaintiff are to pay for their rent under their lease agreements and does not adequately inform consumers of any Convenience Fee in addition to tenants' monthly cost of rent.

27. As a result, consumers like Plaintiff end up paying an additional monthly charge in the form of the Convenience Fee, merely for the opportunity to pay their rent.

28. In short, Plaintiff reasonably understood the advertised lease rates to mean she could pay the amount of that lease by any means provided, and without additional charges or the assessment of additional, unauthorized rent.

29. When Innago contracts with landlords and apartment owners, it fails to put processes in place at the time of leasing that would require landlords and apartment owners who use its service to procure authorization from consumers to use Innago or to pay extra fees or rent to Innago.

30. Innago charges consumers a "pay-to-pay" Convenience Fee on rent payments in an amount beyond the price of their monthly rent obligation. Innago's Convenience Fee amounts to additional and unexpected rent for tenants over and above the amount for which was contracted.

### C. Innago's Convenience Fee is a Junk Fee that Violates Federal Guidance and State Law

31. Innago's pay-to-pay Convenience Fee is precisely the type of "junk fee" that has come under government scrutiny in recent years:

> Junk fees are fees that are mandatory but not transparently disclosed to consumers. Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available. Junk fees harm consumers and actively undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system.[12]

32. As the FTC said recently in its effort to combat junk fees:

> [M]any consumers said that sellers often do not advertise the total amount they will have to pay, and disclose fees only after they are well into completing the transaction. They also said that sellers often misrepresent or do not adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged.[13]

33. In a press release, the FTC articulated the financial harm to consumers arising from "convenience fee[s]" imposed on "captive consumers," such as those who are dealing with a company that has "exclusive rights" like Innago's in particular:

> It's beyond frustrating to end up spending more than you budgeted because of random, arbitrary fees. . . . No one has ever felt that a 'convenience fee' was convenient. Companies should compete to provide the best quality at the best price, not to see who can squeeze the most added expenses out of consumers. That's especially true at a time when families are struggling with the effects of inflation.[14]

34. Similarly, states have taken action to stop such fees. For example, New York's Department of Financial Services has entered into multiple consent orders or agreements with

---

[12] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, Mar. 5, 2024, available at https://bidenwhitehouse.archives.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/.

[13] Federal Trade Commission, *FTC Proposes Rule to Ban Junk Fees – Proposed rule would prohibit hidden and falsely advertised fees*, Oct. 11, 2023, available at https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees.

[14] Federal Trade Commission, *Federal Trade Commission Explores Rule Cracking Down on Junk Fees*, Oct. 20, 2022, available at https://www.ftc.gov/news-events/news/press-releases/2022/10/federal-trade-commission-explores-rule-cracking-down-junk-fees (internal quotation marks omitted).

entities charging unlawful pay-to-pay fees.[15]

35. Effective July 1, 2024, California expanded its Consumers Legal Remedies Act ("CLRA") by amending it to make "drip pricing" illegal, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service.[16] Under the new California law, dubbed the "Honest Pricing Law," it is now illegal to advertise a price without disclosing it may be subject to additional or mandatory fees later. In other words, "the price listed or advertised to the consumer must be the full price that the consumer is required to pay."[17] As the California Department of Justice stated:

> Businesses are free to explain how they set their prices or to *subsequently* itemize the charges that make up the total price that they charge customers. However, the price they advertise or display must be the total price that customers will have to pay for the good or service. Knowing the price of a good [or] service is essential to competition, and displaying a price that is less than what the customer will actually be charged is deceptive.[18]

36. Effective September 2, 2025, the Massachusetts Attorney General promulgated a similar regulation that strictly prohibits businesses from charging unfair or deceptive "junk fees" like Innago's Convenience Fee.[19] In pertinent part, the express terms of this regulation require businesses to disclose, at both the initial and final presentation of the price of any product or

---

[15] *See* Consent Order to Ocwen Financial Corporation, Ocwen Loan Servicing LLC for the following dates: March 27, 2017, Dec. 22, 2014, Dec. 5, 2012 and Dec. 15, 2011, available at https://www.dfs.ny.gov/industry_guidance/enforcement_actions_mortgage.

[16] California Civil Code Section 1770(a)(29).

[17] *See* California Department of Justice, Office of the Attorney General, *SB 478 Frequently Asked Questions*, available at https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf (last accessed July 1, 2026).

[18] *Id*. at p. 4 (emphasis added).

[19] *See* Unfairness and Deception in Connection with Marketing/Solicitation/Sale, 940 C.M.R. 38.04; 38.09.

service, including dwelling units for rent or lease, "any fees, charges, or other expenses . . . that are optional to the consumer or waivable by the seller, the fact that such fees, charges, or other expenses are optional to the consumer or waivable by the seller, as well as readily available instructions regarding how to avoid such fees, charges, or other expenses."[20]

37. In an article, Massachusetts Attorney General Andrea Joy Campbell expounded upon the rollout of the new "junk fee" regulations and explained how "these new rules will require businesses to disclose the full price of their goods and services upfront" in the apartment rental market:

> It's move-in season in Massachusetts, and you may have just seen an ad for a studio apartment for $2,500 per month. That amount is going to stretch your budget, but recognizing how competitive the housing market is, you know you need to jump on that rental quickly.
>
> So, you head to the management office the very next day to sign your lease. Just before signing, you notice the amount you'd have to pay every month will actually be $2,750 – beyond what you have budgeted for rent. The extra $250 comes from a mandatory "trash pick-up" fee combined with a vague "amenities" fee. You don't want to start the daunting apartment search process over again, so you sign the lease. But the entire process leaves you feeling misled and paying more than you originally anticipated.
>
> . . .
>
> These fees are not simply an inconvenience – they're a widespread, costly problem impacting all of us. Every year, Americans spend tens of billions of dollars on hidden or surprise "junk fees" that deceptively raise costs beyond advertised prices. As consumers face rising costs of living, these pesky fees quietly drain consumers' wallets.[21]

---

[20] *Id.* at 38.04(2)(b); (3)(c).

[21] *'Junk Fees' unfairly rob consumers. New Regulations banning them go into effect today*, CommonWealth Beacon, Andrea Joy Campbell, Sept. 2, 2025, available at https://commonwealthbeacon.org/opinion/junk-fees-unfairly-rob-consumers-new-regulations-banning-them-go-into-effect-today/.

38. Innago violates federal guidance and state consumer protection laws by charging the Convenience Fee for processing rent payments on its platform.

**D. Innago's Deceptive Rental Payment Process**

39. Innago's payment platform is how Plaintiff and Class members paid their rent and were assessed the Convenience Fee.

40. Innago's payment platform is deceptive insofar as it fails to adequately disclose the total price consumers will pay and fails to reasonably inform consumers how to avoid the Convenience Fee.

41. Consumers making their rental payments through Innago's payment platform are not adequately informed of the amount Innago charges for the Convenience Fee during the transaction process.

42. Moreover, at no point during the payment process are consumers adequately informed of alternative means to pay their rent to avoid the Convenience Fee, leading consumers to believe the fee is mandatory and unavoidable.

43. Innago's inadequate and untimely disclosure of the Convenience Fee, as well as its failure to adequately inform consumers of alternative ways to pay their rent to avoid the Convenience Fee, is unlawful.

44. What's worse, on information and belief, Innago programs its payment platform to automatically default to a payment method with added Convenience Fees. Upon information and belief, Innago is aware that, by programming its payment platform with a "negative option" to automatically opt-in consumers to pay Convenience Fees, most consumers will pay them. On information and belief, Innago is further aware that, had it programmed its payment platform to

offer an *optional* Convenience Fee (requiring an opt-in or providing fairly disclosed options to remove or avoid such fees), the vast majority of consumers would not pay the Convenience Fee.

45. As the FTC notes in its *Enforcement Policy Statement Regarding Negative Option Marketing*, **"[a] 'pre-checked box' does not constitute affirmative consent."**[22] Here too. By automatically opting consumers into a default payment method that includes fees, Innago tricks consumers into paying additional and unnecessary fees.

**E. Innago's Convenience Fees Are Hidden Profit**

46. Innago's Convenience Fees are also deceptive, unfair and unlawful insofar as they constitute hidden profit.

47. Payments by check can cost payment processors like Innago and landlords and/or property managers anywhere between $1.01 and $2.00 per transaction in processing and other fees, per a 2022 report by the Association for Financial Professionals.[23] Every check needs to be opened, reviewed, keyed into a computer system and deposited. Delays in postal operations and the high risk of human error generate customer service calls and require internal checkpoints and increased oversight. Tenants who are concerned about the timeliness of their rental payment may call to ensure it was received and properly credited, adding to the customer service work associated with this routine part of rent collection.

48. Because it is so expensive to process check transactions, most landlords and/or property managers in the country mandate that their tenants make their monthly rental payments

---

[22] https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf at p. 13 (emphasis added).

[23] *See* https://www.nacha.org/news/ach-costs-are-fraction-check-costs-businesses-afp-survey-shows; https://www.afponline.org/docs/default-source/registered/2022-afp-payments-cost-survey-highlights.pdf.

online via electronic means (*e.g.*, credit card, debit card or ACH transfer). While offered under the auspices of improving services for tenants, the cost of electronic payment methods ranges from a few cents (ACH and debit cards) to 1.97% of the total transaction amount (credit cards).[24] As a result, promoting payment of rent via electronic means reduces landlords' and/or property managers' overhead costs enormously.

49. For many tenants, the automatic ACH system is impractical as it requires a tenant to agree to a fixed amount and date for the debit each month out of a pre-determined bank account and increases a tenant's vulnerability to banking errors. Tenants may have budgetary needs or personal preferences that cause them to want more control over their finances. Some may wish to choose their payment method on a monthly basis. Others may be sharing responsibility for paying the rent with another person, and funds to pay it come from multiple financial accounts.

50. Each time tenants pay their rent through Innago, they are charged Convenience Fees of approximately 2.99% on credit and debit card payments and a $2.00 fee for ACH payments.

51. These fees are materially higher than the costs incurred by Innago, can add up to hundreds of dollars over the life of a lease agreement, and provide millions of dollars in profits for Innago. Such profit is unlawful.[25]

---

[24] *See* https://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm (Following the 2011 passage of the Durbin Amendment, debit card interchange fees in the U.S. are capped at $0.21 plus 0.05% of the transaction value); https://wallethub.com/edu/credit-card-interchange-fees-by-country/129627 (Average credit card interchange fee in the U.S.: 1.97% (Visa) and 1.79% (Mastercard)).

[25] *See, e.g.*, Mass. Gen. Laws Ch. 140D, § 28A (prohibition on the imposition of a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check or similar means); 15 U.S.C. § 1693o-2 (for debit card transactions capped the interchange rate paid to non-exempt card issuers at 0.05 percent plus twenty-one cents), 12 CFR part 235.

52. Innago gets away with its illegal pay-to-pay Convenience Fees because most tenants whose landlords use Innago are forced to complete their rental payments through Innago and cannot choose another payment processor or shop around for a better deal.

53. In short, Innago misleads consumers into believing the Convenience Fees are a legitimate pass-through cost, when they are not. They are an undisclosed source of profit for Innago.

**F. Plaintiff's Experience**

54. Since May 1, 2023, Plaintiff has rented an apartment in Lockport, New York. Plaintiff initially paid her monthly rent via Innago's online payment platform.

55. Plaintiff was charged a Convenience Fee by Innago when using Innago's online platform to make her rent payment on multiple occasions.

56. For example, on March 3, 2025, Plaintiff made a rent payment through Innago and was charged a Convenience Fee totaling $4.00. The Convenience Fee was automatically added to Plaintiff's total during the payment process.

57. Innago's Convenience Fee is not allowed by Plaintiff's lease agreement.

58. Neither Innago nor Plaintiff's landlord adequately or transparently disclosed the existence of Innago's Convenience Fee or how to avoid the Convenience Fee.

59. Plaintiff relied on Innago's misrepresentations and omissions about the Convenience Fee in making her rent payments.

60. Therefore, Plaintiff was unlawfully, unfairly and deceptively charged Convenience Fees that she should not have paid.

61. Once Plaintiff realized she was being charged a Convenience Fee by Innago, she was forced to make special arrangements with her landlord for an alternative payment method that did not involve using Innago's online payment platform.

## PLAINTIFF'S CLAIMS SOUNDING IN FRAUD ARE ALLEGED WITH SPECIFICITY

62. Innago is in the best position to know what content it placed on its payment platform during the relevant timeframe and the knowledge it had regarding the Convenience Fee and related disclosures. To the extent necessary, Plaintiff satisfies the pleading requirements for claims sounding in fraud by alleging the following facts with particularity:

63. **WHO**: Innago unlawfully, unfairly, deceptively and/or misleadingly imposed the Convenience Fee on consumers paying their rent.

64. **WHAT**: Innago's conduct was, and continues to be, fraudulent because it hid, concealed, obfuscated or otherwise disguised additional charges to consumers paying their rent (1) which is in violation of their lease agreements; (2) without disclosing the Convenience Fee or how to avoid it; and (3) which included hidden profit disguised as a pass-through cost. Innago's conduct deceived Plaintiff and Class members insofar as the Convenience Fee is inadequately disclosed and unlawfully charged. Innago knew, or should have known, that the Convenience Fee is undisclosed at the time consumers sign their leases and is in fact barred by those leases. Moreover, Innago knew, or should have known, that it failed to adequately disclose the Convenience Fee and how to avoid it and that this fee is material to reasonable consumers, including Plaintiff and Class members. Moreover, the Convenience Fee is a for-profit "junk fee."

65. **WHEN**: Innago engaged in these unlawful, unfair, deceptive or otherwise misleading practices during the putative Class periods and at the time Plaintiff and Class members

signed their lease agreements and made rental payments through Innago's payment platform, prior to and at the time Plaintiff and Class members made claims after realizing the unlawful junk fee existed and continuously throughout the applicable Class periods.

66. **WHERE**: Innago's unlawful, unfair and deceptive junk fee was uniformly applied to consumers who made rental payments through its payment platform. Innago's website, advertising, other marketing materials and communications with Plaintiff and other tenants failed to explain or otherwise disclose the Convenience Fee being charged.

67. **HOW**: Innago hid, obfuscated or otherwise concealed from consumers the imposition of the Convenience Fee by failing to disclose it or how to avoid it. Consumers are never informed of the fee at the time they sign their lease agreements. Even if consumers were to discover the Convenience Fee, they may reasonably believe it is a pass-through cost, when it is not.

68. **WHY**: Innago engages in its unlawful, unfair and deceptive junk fee scheme to induce Plaintiff, Class members and all reasonable consumers to pay the undisclosed and unlawful Convenience Fee, resulting in significant revenues for Innago.

69. **INJURY**: Plaintiff and Class members paid a premium or otherwise paid more for their rent than they otherwise would have absent Innago's unlawful conduct as alleged herein.

## CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action on her own behalf and on behalf of all others similarly situated. The proposed class includes:

> During the fullest period allowed by law, all persons who were charged a Convenience Fee by Defendant when making a rent payment through Defendant's payment platform while residing in the United States (the "Nationwide Class").

71. Plaintiff further brings this action individually and as a representative of all those similarly situated and the members of the following subclass:

> During the fullest period allowed by law, all persons who were charged a Convenience Fee by Defendant when making a rent payment through Defendant's payment platform while residing in the State of New York (the "New York Class").

72. The Nationwide Class and New York Class are collectively referred to herein as the "Class."

73. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

74. Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class and New York Class and/or to add a class(es), if necessary, before this Court determines whether certification is appropriate.

75. Class members are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identities of whom are within the exclusive knowledge of and can be ascertained only by resort to Defendant's records. The Class is also sufficiently ascertainable because Defendant has the capability through its computer systems and other business records to identify all members of the proposed Class, and such specific information is not otherwise available to Plaintiff.

76. The questions here are ones of common or general interests such that there is a well-defined community of interest among the proposed Class members. These questions predominate over questions that may affect only individual Class members because Defendant acted on grounds generally applicable to the proposed Class. Such common legal or factual questions include, but are not limited to:

a. Whether Defendant's Convenience Fee is unfair, unlawful, deceptive or misleading;

b. Whether Defendant's Convenience Fee constitutes violations of the laws asserted herein;

c. Whether Plaintiff and members of the Class are harmed by Defendant's alleged misconduct;

d. Whether Defendant is unjustly enriched;

e. Whether Defendant tortiously interfered with Class members' lease agreements;

f. Whether Plaintiff and the Class are damaged and if so, the proper measure of damages; and

g. Whether an injunction is necessary to prevent Defendant from continuing to engage in the wrongful conduct alleged herein.

77. Plaintiff's claims are typical of the claims of the other proposed Class members in that they arise out of the same wrongful business practices by Defendant, as alleged herein.

78. Plaintiff is a more than adequate representative of the proposed Class in that she suffered damages because of Defendant's improper business practices. Additionally:

a. Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and retained competent counsel experienced in the prosecution of consumer class actions;

b. There is no conflict of interest between Plaintiff and other Class members;

c. Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d. Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

79. Common questions of fact or law concerning Defendant's liability to all Class members for charging the Convenience Fee on rent payments through its payment platform predominate over any questions affecting only individual Class members. Plaintiff's proposed class action is the superior method for resolving this dispute because it is impracticable to bring proposed Class members' individual claims before the Court, especially where, as here, individual Class members' damages are relatively small. Class treatment permits many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class action mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

80. Defendant has acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

81. Plaintiff's claims consist of issues that are common to all members of the Class and are capable of class-wide resolution that will significantly advance the litigation.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Tortious Interference with Contract

***(By Plaintiff, individually, and on behalf of the Nationwide Class and New York Class)***

82. Plaintiff, individually, and on behalf of the Nationwide Class and alternatively, the New York Class, realleges and incorporates the preceding paragraphs as if fully set forth herein.

83. Plaintiff and members of the Class entered into valid lease agreements with rental property management companies and/or landlords based on their economic necessity for rental housing services.

84. The lease agreements do not disclose or authorize the imposition of Convenience Fees.

85. Defendant knew, or should have known, about this contractual relationship when it acted as the third-party platform through which Plaintiff and Class members were required to make monthly rental payments to rental property management companies and landlords.

86. Defendant intentionally and/or wrongfully interfered with those lease agreements to Plaintiff's and Class members' detriment by charging the Convenience Fee, which amounted to undisclosed rent costs.

87. Defendant's act of charging the Convenience Fee on Plaintiff's and Class members' rent payments was designed to induce and did induce breach and/or disruption of their contractual relationship with those entities.

88. Defendant's intentional interference caused Plaintiff and members of the Class actual harm in the form of the wrongfully collected Convenience Fee.

## SECOND CAUSE OF ACTION

**Violations of New York General Business Law ("GBL") § 349**
***(By Plaintiff, individually, and on behalf of the New York Class)***

89. Plaintiff, individually, and on behalf of the New York Class, realleges and incorporates the preceding paragraphs as if fully set forth herein.

90. Defendant's conduct alleged herein violates GBL § 349, which prohibits, among other things, unfair, deceptive or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

91. Defendant's rent payment collection services constitute business and trade, as well as services, within the meaning of GBL § 349.

92. Plaintiff and New York Class members are consumers who utilized Defendant's services for personal use.

93. Defendant violates GBL § 349 by: (1) charging Convenience Fees that it is not allowed to charge under the underlying lease agreements; (2) misrepresenting such Convenience Fees as lawful, mandatory and authorized; (3) charging Convenience Fees that serve no legitimate purpose except profit for Defendant at consumers' expense; (4) failing to adequately and transparently disclose the existence of the Convenience Fees; and (5) failing to adequately and transparently disclose alternative payment options to avoid the Convenience Fees.

94. By the acts, misrepresentations, and omissions alleged herein, Defendant has engaged in deceptive and misleading acts and practices designed to covertly and improperly squeeze additional money from consumers for its own profit.

95. Defendant's deceptive imposition of Convenience Fees on consumers without their knowledge or consent provides no value or convenience to consumers.

96. Defendant's deceptive acts, misrepresentations and omissions have a tendency to deceive, and in fact deceived, the general public, including Plaintiff and the New York Class.

97. Defendant's deceptive acts, misrepresentations and omissions were and are material, in that they were likely to, and did in fact, mislead reasonable consumers with respect to the transactions they completed through Defendant's online platform.

98. Although not required by New York law, Plaintiff and New York Class members reasonably relied on Defendant's material misrepresentations, omissions and deceptive practices.

99. As a direct and proximate result of Defendant's deceptive actions, misrepresentations and omissions as alleged herein, Plaintiff and New York Class members have been harmed and have lost money in the amount of the Convenience Fees they were forced to pay.

100. Defendant's actions were the direct, foreseeable and proximate cause of the damages that Plaintiff and the New York Class have sustained.

101. As a result of Defendant's deceptive actions, misrepresentations and omissions as alleged herein, Plaintiff and New York Class members are each entitled: (1) to recover $50 or the damages they sustained, whichever is greater; (2) to treble damages, because Defendant willingly and knowingly committed deceptive acts and practices in violation of GBL § 349; and (3) to initiate a program to provide refunds and/or restitution to the New York Class. Plaintiff is also entitled to reasonable attorneys' fees from Defendant.

## THIRD CAUSE OF ACTION

**Ohio Consumer Sales Practices Act ("CSPA")**
**Violations of Ohio Rev. Code §§ 1345.01, *et seq.***
***(By Plaintiff, individually, and on behalf of the Class)***

102. Plaintiff, individually, and on behalf of the Class, realleges and incorporates the preceding paragraphs as if fully set forth herein.

103. Defendant's unlawful conduct emanates from its headquarters in Ohio and therefore it is appropriate to apply Ohio law on behalf of the Class.

104. The CSPA declares unlawful unfair or deceptive acts or practices in connection with a consumer transaction.

105. Plaintiff and Class members are "consumers" as defined in the CSPA. Defendant's collection of rent payments via its online platform is a "consumer transaction" as defined in the CSPA.

106. Defendant is a "supplier" as defined in the CSPA because it is engaged in the business of effecting consumer transactions—namely, an online rent-payment service that it provides directly to consumers for their personal, family or household purposes and for which it charges consumers the Convenience Fee.

107. Defendant committed unfair and deceptive acts and practices in violation of the CSPA by: (1) charging Convenience Fees that it is not allowed to charge under the underlying lease agreements; (2) misrepresenting such Convenience Fees as lawful, mandatory and authorized; (3) charging Convenience Fees that serve no legitimate purpose except profit for Defendant at consumers' expense; (4) failing to adequately and transparently disclose the existence of the Convenience Fees; and (5) failing to adequately and transparently disclose alternative payment options to avoid the Convenience Fees.

108. Additionally, pursuant to the Ohio Attorney General's substantive rule, Ohio Admin. Code 109:4-3-02, it is a deceptive act or practice for a supplier to make an offer—including an offer made through any online or digital medium—without stating clearly and conspicuously, in close proximity to the words stating the offer, any material exclusions, reservations, limitations,

modifications, or conditions, including any additional charge or fee imposed in connection with the transaction.

109. A disclosure relegated to a footnote, asterisk, hyperlink, or fine print is not "clearly and conspicuously" disclosed within the meaning of the rule.

110. Defendant violated, and continues to violate, the CSPA and Ohio Admin. Code 109:4-3-02 by displaying the monthly amount of rent due on its online payment interface without clearly and conspicuously disclosing its automatically added Convenience Fee in close proximity to that price, and without disclosing how the Convenience Fee could be avoided.

111. Defendant further committed deceptive acts and practices in violation of Ohio Rev. Code § 1345.02(B) by charging Convenience Fees that were not authorized under the underlying lease agreements while representing those fees to be lawful and authorized.

112. Defendant's imposition of the Convenience Fee is also an unconscionable act or practice in violation of Ohio Rev. Code § 1345.03 in that, among other things, Defendant knowingly took advantage of the inability of consumers to protect their interests and extracted fees providing no corresponding value.

113. Defendant knew, or should have known, that its policy and practice of assessing the Convenience Fee on rent payments was a deceptive, unfair and unconscionable practice.

114. As a direct and proximate result of Defendant's ongoing violations of the CSPA, Plaintiff and the Class suffered damages in the amount of the Convenience Fees they were forced to pay.

115. Plaintiff and each member of the Class are entitled to recover all damages available under the CSPA, rescission of the affected transactions, declaratory and injunctive relief and reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

**Unjust Enrichment**
***(By Plaintiff, individually, and on behalf of the Class)***

116. Plaintiff, individually, and on behalf of the Class, realleges and incorporates the preceding paragraphs as if fully set forth herein.

117. To the detriment of Plaintiff and Class members, Defendant was, and continues to be, unjustly enriched because of its wrongful conduct as alleged herein.

118. Plaintiff and Class members conferred a benefit on Defendant.

119. Defendant unfairly, deceptively, unjustly and/or unlawfully accepted said benefit, which under the circumstances, would be unjust to allow Defendant to retain.

120. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

121. Plaintiff and Class members, therefore, seek disgorgement of all wrongfully obtained Convenience Fees received by Defendant because of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant for herself and the proposed Class as follows:

a. Certifying the proposed Class(es), appointing Plaintiff as representative of the Class(es), and appointing her counsel as class counsel for the proposed Class(es);

b. Declaring that Defendant's Convenience Fee and its policies and practices as alleged herein are improper;

c. Enjoining Defendant from the wrongful conduct alleged herein on behalf of the general public, including, but not limited to, the removal of charges incurred by Plaintiff and Class members for Defendant's pay-to-pay Convenience Fee;

d. For an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth herein;

e. Awarding actual damages and statutory damages in an amount according to proof;

f. Awarding treble damages as permitted by law;

g. Awarding pre-judgment interest at the maximum rate permitted by law;

h. Reimbursing all costs, expenses and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

i. Awarding such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and all others similarly situated hereby demand a jury trial on all issues in this Complaint that are so triable as a matter of right.

Dated: July 2, 2026

**KALIELGOLD PLLC**

By: */s/ Justin J. Swofford*

Justin J. Swofford (PA Bar No. 334768)
Jeffrey D. Kaliel*
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
jswofford@kalielgold.com
jkaliel@kalielpllc.com

Sophia G. Gold*

Amanda J. Rosenberg*
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783
sgold@kalielgold.com
arosenberg@kalielgold.com

*Attorneys for Plaintiff and the Putative Class*

*(to be admitted *pro hac vice*)